**HOOSIER ROLL SHOP SERVICES, LLC, Petitioner,**

v.

**INDIANA DEPARTMENT OF STATE REVENUE, Respondent.**

No. 49T10–1104–TA–29.

Tax Court of Indiana.

May 14, 2014.

Ronald M. Soskin, Bose McKinney & Evans LLP, Indianapolis, IN, Attorney for Petitioner.

Gregory F. Zoeller, Attorney General of Indiana, John P. Lowrey, Deputy Attorney General, Indianapolis, IN, Attorneys for Respondent.

## ORDER ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

FISHER, Senior Judge.

Hoosier Roll Shop Services, LLC has challenged the Indiana Department of

State Revenue's (Department) final determination denying it an exemption from Indiana's sales and use taxes for equipment it used and materials it consumed in grinding and calibrating its customers' work rolls during the 2007 and 2008 tax years (the years at issue). The matter, currently before the Court on the parties' cross-motions for summary judgment, presents one issue: whether in grinding and calibrating its customers' work rolls, Hoosier Roll produces other tangible personal property. The Court finds that it does.

## FACTS

### *Background*

Generally speaking, mills are in the business of converting slabs of raw steel, aluminum, and paper pulp into "sheets" of finished product for their customers: steel suitable for use as automobile framing or refrigerator doors; aluminum suitable for baking foil and dishes or beverage cans; and paper suitable for cigarettes, facsimile machines, or cardboard boxes. (*See, e.g.,* Pet'r Am. Jt. Stipulation Facts ("Jt. Stip.") ¶¶ 18–19; Pet'r Des'g Evid. Supp. Mot. Summ. J., Ex. 5 (hereinafter "Burke Aff.") ¶¶ 6, 12, 15, 23–24.) The mills accomplish this conversion through a high-tech rolling process: they run the raw slabs and pulp along a conveyer-belt type mechanism and through huge rolling machines at speeds often exceeding three thousand feet per minute. (Jt. Stip. ¶¶ 18, 20.) The rolling process "is so precise that variations of more than a ten-thousandth to ten-millionth of an inch may reduce the rolled product to scrap." (Burke Aff. ¶ 14.)

A rolling machine contains two work rolls, each weighing up to 5,900 pounds. (Jt. Stip. ¶ 21.) The work rolls operate like giant rolling pins to create the proper thickness,[1] flatness,[2] surface texture,[3] and luster[4] of the sheet product as it passes between them. (*See* Jt. Stip. ¶ 22.) In order for the work rolls to create the proper thickness, flatness, surface texture, and luster of the sheet product, their surfaces must be ground and calibrated to certain specifications. (Jt. Stip. ¶¶ 23, 25, 28.) While some mills grind and calibrate their work rolls in-house, others outsource their work to roll shops like Hoosier Roll.[5] (Burke Aff. ¶ 8.)

When mills purchase new work rolls, they are blank and must be ground and calibrated before they can even be used. (Jt. Stip. ¶¶ 24–25.) Once used for a specific job, the work rolls can be ground and calibrated to entirely new specifications and then used to produce an entirely dif-

---

1. Steel slabs begin at a thickness of nine to twelve inches and, based on customer specifications, may be reduced to a thickness of as little as .0149 inches. (*See* Pet'r Am. Jt. Stipulation Facts ("Jt. Stip.") ¶¶ 25, 29.) Aluminum is reduced to a thickness of .00067 inches for purposes of household aluminum (*i.e.*, baking foil). (Jt. Stip. ¶ 30.)

2. While sheets of steel, aluminum, and paper may look flat to the human eye, the sheets actually have very fine crowns or valleys and must be ground with specific concave or convex curvatures, usually measured to the nearest .0001 inch. (Jt. Stip. ¶ 32; Pet'r Des'g Evid. Supp. Mot. Summ. J., Ex. 5 (hereinafter "Burke Aff.") ¶ 19.)

3. The surface texture of finished paper varies from the slick surfaces used for facsimile machine and copier paper to the rougher surfaces used in cardboard. (Jt. Stip. ¶ 31; Burke Aff. ¶ 18.)

4. Different lusters are required for steel or aluminum depending on whether it is to be painted or stamped. (Jt. Stip. ¶ 33; Burke Aff. ¶ 20.)

5. Hoosier Roll is located in Hammond, Indiana. (*See* Resp't Des'g Evid. Opp'n Pet'r Mot. Summ. J. (hereinafter "Resp't Des'g Evid."), Ex. 2 at 1, 3.)

ferent sheet product.[6] (*See* Jt. Stip. ¶ 27.) A work roll can be ground and calibrated between 66 and 200 times (depending on whether it is a "hot mill" or a "cold mill" work roll); the mean number of times that a work roll is ground and calibrated is 40 times. (*See* Resp't Des'g Evid. Opp'n Pet'r Mot. Summ. J. (hereinafter "Resp't Des'g Evid."), Ex. 6, Interrogs. 13, 14.)

### Hoosier Roll's Process

When Hoosier Roll is engaged by a customer to grind and calibrate work rolls, it first inspects and tests the work rolls to determine if they are salvageable.[7] (*See* Resp't Des'g Evid., Ex. 3 (hereinafter "Department's LOF") at 6–7.) Furthermore, it must remove any coating materials that are present on the work rolls. (Department's LOF at 6.)

In order to grind and calibrate work rolls to meet its customer's specifications, Hoosier Roll inputs certain data into its specialized CAD–CAM type computer system. (*See* Jt. Stip. ¶¶ 34, 38, 41; Burke Aff. ¶ 14.) The computer system feeds the data to an operator who then prepares the grinding equipment. (Jt. Stip. ¶ 42.) For instance, drivers are attached to the grinding equipment enabling the work rolls to spin, blank steel plates and welding equipment fashion the drivers to fit the work rolls, and appropriate grinding wheels are installed and dressed for the desired grind by using diamonds, solvents, and other products. (Jt. Stip. ¶¶ 44–46.)

Once the grinders have been prepared, Hoosier Roll mounts the work rolls on the grinders using cranes or propane-fueled forklifts. (Jt. Stip. ¶¶ 43, 47.) Throughout the grinding process, Hoosier Roll must not only continuously apply lubricants and coolants to reduce friction that could cause the work roll to expand (resulting in an uneven grind), but must also monitor the grind to ensure that it conforms to the required specifications. (Jt. Stip. ¶¶ 51, 53, 59–60.) Hoosier Roll uses various types of computerized equipment, including electronic saddle micrometers and ultrasound, to monitor the grinding process. (Jt. Stip. ¶¶ 50–51, 53–54, 58, 61.) Once the grinding process is complete, Hoosier Roll wraps the work roll to protect it from damage during subsequent shipping. (Jt. Stip. ¶ 63.)

### Procedural History

On March 11, 2010, the Department completed an audit of Hoosier Roll. The Department explained in its audit report that while Hoosier Roll purchased certain items during the years at issue for use in its grinding and calibration operation, "[s]ales tax was not paid at the time of purchase . . . and use tax was not accrued and paid." (Resp't Des'g Evid., Ex. 2 at 3.) Consequently, on April 5, 2010, the Department issued notices of Proposed Assessment to Hoosier Roll.[8]

Hoosier Roll subsequently protested the proposed assessments, claiming that the purchases at issue were exempt from taxation. On August 31, 2010, the Department conducted an administrative hearing on the matter. In a letter of findings dated

---

**6.** Indeed, "[g]iven just-in-time inventory systems, shorter production runs are required with virtually all jobs completed before the work rolls wear out." (Jt. Stip. ¶ 26.)

**7.** For instance, if a previously used work roll is too soft, bruised or cracked, it might not accept the new grinding specifications. (*See* Resp't Des'g Evid., Ex. 3 (hereinafter "Department's LOF") at 6–7.) In such cases, the work roll cannot be used and will be scrapped. (Department's LOF at 6–7.) This, however, is not an issue with respect to new work rolls. (Department's LOF at 6.)

**8.** While the Department also assessed Hoosier Roll with a negligence penalty, it has since withdrawn that penalty assessment. (*See* Jt. Stip. ¶¶ 6, 9–10.)

January 24, 2011 (LOF), the Department denied Hoosier Roll's protest. Hoosier Roll subsequently requested a rehearing, which the Department denied.

On April 21, 2011, Hoosier Roll filed an original tax appeal. On March 14, 2012, both Hoosier Roll and the Department filed motions for summary judgment. The Court conducted a hearing on those motions on May 11, 2012. Additional facts will be provided when necessary.

## STANDARD OF REVIEW

Summary judgment is appropriate only when the designated evidence demonstrates that no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). Cross-motions for summary judgment do not alter this standard. *Horseshoe Hammond, LLC v. Indiana Dep't of State Revenue*, 865 N.E.2d 725, 727 (Ind. Tax Ct.2007), *review denied.*

## LAW

Indiana imposes both a sales tax and a use tax. The sales tax, also known as the state gross retail tax, applies to retail transactions that occur in Indiana. IND.CODE § 6–2.5–2–1(a) (2007). The use tax applies to storing, using, or consuming in Indiana tangible personal property acquired in a retail transaction regardless of where that transaction occurred or where the retail merchant was located.[9] IND.CODE § 6–2.5–3–2(a) (2007).

In an effort to encourage industrial growth and to limit the effect of tax pyra-

miding, the Indiana legislature has enacted several statutes, collectively referred to as "the industrial exemptions," that exempt from the sales and use taxes certain purchases of tangible personal property that is used or consumed in the production of other tangible personal property. *See Harlan Sprague Dawley, Inc. v. Indiana Dep't of State Revenue*, 605 N.E.2d 1222, 1225, 1228 (Ind. Tax Ct.1992). Three of these exemptions are at issue in this case and provide:

> [T]ransactions involving manufacturing machinery, tools, and equipment are exempt from the state gross retail tax if the person acquiring that property acquires it for direct use in the direct production, manufacture, fabrication, assembly, extraction, mining, processing, refining, or finishing of other tangible personal property.

IND.CODE § 6–2.5–5–3(b) (2007).

> Transactions involving tangible personal property are exempt from the state gross retail tax if the person acquiring the property acquires it for his direct use in the direct production of the machinery, tools, or equipment described in [INDIANA CODE § 6–2.5–5–3].

IND.CODE § 6–2.5–5–4 (2007).

> Transactions involving tangible personal property are exempt from the state gross retail tax if the person acquiring the property acquires it for direct consumption as a material to be consumed in the direct production of other tangible personal property in the person's busi-

9. The use tax is complementary to the sales tax because it is primarily designed to reach out-of-state sales of tangible personal property that is subsequently used in Indiana. *Horseshoe Hammond, LLC v. Indiana Dep't of State Revenue*, 865 N.E.2d 725, 727 (Ind. Tax Ct.2007), *review denied; Morton Bldgs., Inc. v. Indiana Dep't of State Revenue*, 819 N.E.2d 913, 915 (Ind. Tax Ct.2004), *abrogated on* *other grounds.* "This complementary formulation exists to ensure that the Indiana sales tax may not be avoided by purchasing products in states where there is no sales tax or where there is a lower sales tax." *Morton*, 819 N.E.2d at 915 (citations omitted). "Accordingly, the use tax bites where the sales tax does not." *Id.* (citation omitted).

ness of manufacturing, processing, refining, repairing, mining, agriculture, horticulture, floriculture, or arboriculture. IND.CODE § 6–2.5–5–5.1(b) (2007).[10] While each of these exemption provisions can apply to a host of different activities and factual situations, they are similar in that they each require the production of other tangible personal property.

## ANALYSIS

■ The parties' motions for summary judgment present just one issue for the Court to decide: whether Hoosier Roll produces a new good, thereby entitling it to the exemptions previously mentioned, when it grinds and calibrates work rolls. Hoosier Roll claims that it does: it takes a work roll, a tool ground and calibrated for a certain use and, through its grinding and calibration process, creates an entirely new tool for a different use (*i.e.*, a remanufactured work roll). (*See, e.g.*, Pet'r Mem. Supp. Mot. Summ. J. ("Pet'r Br.") at 16–18.) The Department argues, however, that Hoosier Roll does not produce a new good; rather, it provides a repair service that is designed merely to perpetuate the usable life of the work roll. (*See, e.g.*, Resp't Br. Supp. Mot. Summ. J. ("Resp't Br.") at 7, 11.)

In *Rotation Products Corporation v. Department of State Revenue*, 690 N.E.2d 795 (Ind. Tax Ct.1998), this Court explained that merely characterizing a process as "remanufacturing" or "repair" is not helpful in determining whether the process actually produces a new product and is thus an exempt activity. *See Rotation Prods. Corp. v. Dep't of State Revenue*, 690 N.E.2d 795, 800–02 (Ind. Tax Ct.1998) (explaining that some repair activities might constitute production while some remanufacturing activities might not). Consequently, in that case, the Court developed four questions, based on its analysis of case law from both Indiana and other jurisdictions, to assist it in determining whether a "remanufacturing" or "repairing" process produces a new product. *See id.* at 800–03. Here, both Hoosier Roll and the Department agree that the Court can determine whether Hoosier Roll produces a new good when it grinds and calibrates work rolls by using the facts they have presented to answer the questions set forth in *Rotation Products.* (*See, e.g.*, Pet'r Br. at 16–19; Resp't Br. at 7–9.)

*QUESTION 1:* **What is the substantiality and complexity of the work done on the existing article and what are the physical changes to the existing article, including the addition of new parts ?**

In answering this first question, the Court finds that Hoosier Roll makes substantial physical changes to the work rolls it receives from its customers through its complex process of grinding and calibration. Indeed, the surfaces of the work rolls—whether the rolls are new and blank or have been previously ground and calibrated to certain specifications—must be physically altered before the work rolls can be used to produce a specified sheet product. As a result of this physical alteration, the work roll Hoosier Roll returns to its customer is not the same work roll that the customer originally delivered to Hoosier Roll. As Hoosier Roll very convincingly explained, it takes a work roll, a tool ground and calibrated for a certain use and, through its grinding and calibration process, creates an entirely new tool for a different use. (*See* Pet'r Br. at 16–18.)

---

**10.** These sales tax exemptions also apply to the use tax. *See* IND.CODE § 6–2.5–3–4(a)(2) (2007).

The Department acknowledges that while Hoosier Roll's grinding and calibration process is complex, it "does not substantially change the underlying good" as the process "*begins and ends* with a giant rolling pin that is used to flatten things." (Resp't Br. at 7; Hr'g Tr. at 33 (emphasis added).) While it is true that when Hoosier Roll's process is completed its customer still has a work roll, the Department's argument fails to recognize that the intended use of that work roll—and thus the form of its physical surface—is very different from the use and form of the work roll when the customer first delivered it to Hoosier Roll. *See, e.g., Rotation Prods. Corp.*, 690 N.E.2d at 804 (explaining that with respect to a remanufactured roller bearing, the new working surface has a very different "geometry" from the original and is therefore a new and different product from the original).

**QUESTION 2: How does the article's value before and after the work compare?**

With respect to this second question, the Court finds that Hoosier Roll's grinding and calibration process adds value to a work roll that was not there when the work roll was first delivered to it. This is evidenced by the fact that at the time a customer brings its work rolls to Hoosier Roll, it can no longer use them for their specified purpose. *See, e.g., supra* at note 6. Once ground and calibrated to new specifications, however, the customer can use the work roll again, as it has been transformed into a new tool.

Nonetheless, the Department asserts that because work rolls are initially manufactured and sold blank, they must have "an intrinsic value of themselves." (*See* Hr'g Tr. at 33.) Accordingly, if any value results from Hoosier Roll's grinding and calibration process, it is "only" use value to Hoosier Roll's customer which "does not

increase the value or marketability of the work roll itself." (Resp't Br. at 8.) This Court, however, has previously rejected the notion that the term "value" does not encompass use value. *See Rotation Prods. Corp.*, 690 N.E.2d at 802 (recognizing that a manufacturing process converts material " 'having no commercial value *for its intended use* . . . [to material that] has appreciable commercial value *for its intended use* ' " (emphases added) (citation omitted)).

**QUESTION 3: How favorably does the performance of the "remanufactured" article compare with the performance of newly manufactured articles of its kind?**

There is no dispute that each time a work roll is ground and calibrated to certain specifications, its performance as a work roll is no less favorable than its performance as a work roll with the previously ground and calibrated specifications. Consequently, the Department has conceded that the answer to this third inquiry weighs in Hoosier Roll's favor. (*See* Resp't Br. at 7; Hr'g Tr. at 28, 35.) (*See also* Department's LOF at 7 (acknowledging that "the refurbished rolls perform as well as brand new work rolls").)

**QUESTION 4: Was the work performed contemplated as a normal part of the life cycle of the existing article?**

In answering the fourth and final question advanced by *Rotation Products*, the Court finds that Hoosier Roll's grinding and calibration process is not work that is contemplated as a normal part of a work roll's life cycle. Indeed, grinding and calibrating work rolls is not "routine maintenance." *See Rotation Prods. Corp.*, 690 N.E.2d at 803 (explaining that the process of cleaning and polishing an item so that it functions more efficiently may be "routine maintenance" or a normal part of its life cycle). Rather, as previously explained,

when Hoosier Roll grinds and calibrates work rolls, it physically transforms them into entirely new and different tools that are used by its customers to create entirely new and different sheet products. This finding is further buttressed by the fact that when Hoosier Roll's customers send their work rolls to Hoosier Roll, they are aware that the work rolls may not even be salvageable in the first instance. (*See, e.g.,* Department's LOF at 7.)

## CONCLUSION

In *Rotation Products,* this Court developed four questions that would assist it in determining whether a "remanufacturing" or "repairing" process produces a new product. The Court has determined that, in this case, the answer to each of those four questions favors Hoosier Roll; that is, Hoosier Roll produces other tangible personal property when it grinds and calibrates its customers' work rolls. Consequently, the Court GRANTS summary judgment in favor of Hoosier Roll and AGAINST the Department.

SO ORDERED.