ATTORNEY FOR PETITIONER:

**CRAIG M. McKEE**
WILKINSON, GOELLER, MODESITT,
WILKINSON & DRUMMY, LLP
Terre Haute, IN

ATTORNEYS FOR RESPONDENT:

**GREGORY F. ZOELLER**
ATTORNEY GENERAL OF INDIANA
**JOHN P. LOWREY**
DEPUTY ATTORNEY GENERAL
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

**FILED**

Feb 16 2015, 2:17 pm

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

| | |
|---|---|
| ALLOY CUSTOM PRODUCTS, INC., | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Cause No. 49T10-1102-TA-00017 |
| | ) |
| INDIANA DEPARTMENT OF | ) |
| STATE REVENUE, | ) |
| | ) |
| Respondent. | ) |

## ORDER ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

**FOR PUBLICATION**
**February 16, 2015**

FISHER, Senior Judge

Alloy Custom Products, Inc. has challenged the Indiana Department of State Revenue's (Department) final determination denying it a refund of the Indiana sales tax it paid on utilities it consumed while "rehabilitating" cryogenic tanker trailers between September 2006 and March 2010 (the period at issue). The matter is currently before the Court on the parties' cross-motions for summary judgment.

## FACTS

## Background

Alloy is in the business of manufacturing new cryogenic tanker trailers as well as what it calls "rehabilitating" used cryogenic tanker trailers. (Resp't Des'g Evid. Supp. Mot. Summ. J. ("Resp't Des'g Evid."), Ex. 1 ¶ 1, Ex. 4 at 1; Pet'r Resp. Opp'n Resp't Mot. Summ. J. & Supp. Cross-Mot. Summ. J. ("Pet'r Br.") at 2.) A cryogenic tanker trailer is used to transport atmospheric gases in a liquid state.[1] (Pet'r Des'g Evid. Supp. Mot. Summ. J. (hereinafter, "Boatman Aff.") ¶¶ 3, 5.) A cryogenic tanker trailer

> consists of the bottle (the two layered cylinder storage tank for the gas) and several sub-assemblies which are pumping, air[,] and vacuum systems powered by a resident engine. These sub-assemblies are the means to provide the temperature protection by vacuum to the stored and transported gas in addition to efficient loading and unloading systems.

(Resp't Des'g Evid., Ex. 4 at 1.)

Alloy's facility, located near Delphi, Indiana, consists of three separate buildings. (Resp't Des'g Evid., Ex. 1 ¶ 1, Ex. 3 at 1, 3, Ex. 7 at 8-10.) One building is used solely for the manufacture of new tanker trailers. (Resp't Des'g Evid., Ex. 1 ¶ 1, Ex. 7 at 8-10.) The second building is used solely for the rehabilitation of used tanker trailers. (Resp't Des'g Evid., Ex. 1 ¶ 1, Ex. 7 at 8-10.) The third building is used for the sandblasting and repainting of rehabilitated tanker trailers. (Resp't Des'g Evid., Ex. 1 ¶ 1, Ex. 7 at 8-

---

[1] For example:

> Liquid nitrogen, a common type of cargo in these tanker-trailers, boils at -320 degrees F. If the temperature of the cargo rises above that temperature, product boils off and enters the atmosphere – the cargo essentially dissipates into thin air. The inner vessel of one of these trailers is insulated from the ambient temperature by special insulation and vacuum technology much like a Thermos bottle.

(Pet'r Des'g Evid. Supp. Mot. Summ. J. (hereinafter, "Boatman Aff.") ¶ 3.)

10.)  While each building has its own electric meter, all three buildings share a single natural gas meter.  (Resp't Des'g Evid., Ex. 1 ¶ 2, Ex. 7 at 10-11.)

## Alloy's Rehabilitation Process

The typical life span of a cryogenic tanker trailer is six to ten years.  (See Resp't Des'g Evid., Ex. 4 at 1, Ex. 7 at 5.)  "As [it] wear[s] out, an owner can take [it] out of service or have [it] . . . rehabbed into 'like new' to extend [its] useful life."  (Boatman Aff. ¶ 5.)  (See also Resp't Des'g Evid., Ex. 4 at 3-4 (claiming that "[w]hen the rehab is finished, it is the equivalent of a new tanker").)  A tanker trailer is "worn out" when the bottle no longer holds a vacuum.  (Boatman Aff. ¶ 5; Hr'g Tr. at 44.)  Indeed,

> [w]hen the void space between the inner and outer vessel [of the bottle] is compromised by the introduction of atmosphere, the integrity and the benefit of the vacuum technology degrades and causes product loss.  Rehabbing the outer vessel is essential to maintaining the vacuum and using the trailer for its intended purpose when manufactured.  A trailer that cannot maintain the proper temperature or no longer maintains a reliable vacuum is essentially worthless for its intended purpose.

(Boatman Aff. ¶ 3.)

Alloy states that through its rehabilitation process, it not only refurbishes the bottle's vacuum, but it also might upgrade the tanker trailer to current industry standards.  (See Resp't Des'g Evid., Ex. 1 ¶ 1, Ex. 4 at 1-2 (explaining that rehabilitation "is an ideal time to upgrade the tanker to new and current improvements and requirements such as air suspension, ABS braking systems, fire valves, improved emissions, upgraded electrical and air systems"), Ex. 6 at 5 (stating "the rehab process may include upgrades such as new standards and technologies for emissions, suspensions, engines and valves that were not part of the original manufactured

trailer").)  A rehabilitation can extend a trailer's useful life by approximately four to six years.  (See Resp't Des'g Evid., Ex. 7 at 5.)

When a trailer is brought in for rehabilitation, Alloy first purges it with nitrogen gas, ensuring that it contains no hazardous gases and that it poses no threat of explosion.  (See Resp't Des'g Evid., Ex. 7 at 16.)  Alloy then inspects the trailer's various systems (e.g., vacuum, piping, engine drive, exterior chassis, and inner vessel). (See Resp't Des'g Evid., Ex. 7 at 16-18.)  Once it completes its inspection, Alloy presents the owner with an estimate of the recommended work necessary (and cost) to rehabilitate the trailer.  (See Resp't Des'g Evid., Ex. 7 at 19.)  If the owner accepts the estimate, Alloy orders the necessary parts and materials needed to complete the work and schedules each rehabilitation task within its computer system.[2]  (See Resp't Des'g Evid., Ex. 7 at 20.)

After stripping the trailer down to its bottle and removing all sub-assemblies and several other components, Alloy sandblasts everything to remove paint, rust, and mill scale.[3]  (See Resp't Des'g Evid., Ex. 4 at 1-3, Ex. 7 at 22-23.)  Next, Alloy repairs the leaks within the bottle and the vacuum system and completes any replacement of, or repair work on, the sub-assemblies.  (See Resp't Des'g Evid., Ex. 7 at 25-26.)  All sub-

---

[2]  Alloy keeps an inventory of parts that it uses in both its manufacture of new, as well as its rehabilitation of used, trailers.  (See Resp't Des'g Evid. Supp. Mot. Summ. J. ("Resp't Des'g Evid."), Ex. 6 at 6-7; Boatman Aff. ¶ 6.)  Alloy also allows its customers to supply parts if they can acquire them at a more favorable cost than Alloy.  (See Resp't Des'g Evid., Ex. 5, Ex. 6 at 7-8; Boatman Aff. ¶ 6.)

[3]  At this point, Alloy might submit a revised estimate to the trailer's owner.  (See Resp't Des'g Evid., Ex. 7 at 24 (explaining that after sandblasting, a revised estimate might be provided to include previously undiscovered but necessary rehabilitation work).)

assemblies are pre-fit to the tank to ensure a proper fit.  (See Resp't Des'g Evid., Ex. 7 at 26.)

Before reinstalling the sub-assemblies, Alloy primes and paints the trailer to the owner's specifications, using a polyurethane enamel paint.  (See Resp't Des'g Evid., Ex. 7 at 27-29.)  Once dry, Alloy reinstalls all other components and then conducts warm/cold retention tests, engine run tests, piping leak tests, and air and brake system checks.  (See Resp't Des'g Evid., Ex. 7 at 30.)  The trailer is then ready for delivery back to its owner.  (See Resp't Des'g Evid., Ex. 7 at 30.)

A typical rehabilitation process takes approximately 750 man-hours over a six to eight week period.  (Boatman Aff. ¶ 7.)  A cryogenic tanker trailer can be rehabilitated three or four times.  (See Resp't Des'g Evid., Ex. 7 at 7.)

## Procedural History

On October 8, 2009, Alloy filed four Forms ST-200 ("Utility Sales Tax Exemption Application") and a Form GA-110L ("Claim for Refund") with the Department covering the period between September 2006 and September 30, 2009.  (See Resp't Des'g Evid., Ex. 1 ¶¶ 2-3.)  In those Forms, Alloy asserted that its metered purchases of electric and gas should have been exempt from sales tax because it consumed those utilities in its manufacturing and rehabilitation process.  (See Resp't Des'g Evid., Ex. 1 ¶¶ 2-3.)  On April 2, 2010, Alloy filed a second Form GA-110L seeking a refund of sales tax it paid on its metered purchases of electric and gas between October 1, 2009 and March 31, 2010.  (See Resp't Des'g Evid., Ex. 1 ¶ 3.)

The Department subsequently conducted a review of Alloy's business and approved the exemption and refund for the electric metered purchases on the building

used for the manufacture of new tanker trailers. The Department denied the exemption and refund, however, for the other two electric meters (i.e., the meters on the two buildings used for the rehabilitation of used tanker trailers). (See Resp't Des'g Evid., Ex. 1 ¶ 4, Ex. 3 at 3-5.) With respect to the gas meter, the Department approved a partial exemption and refund in the amount of 45% (i.e., the amount of gas it determined was consumed in the building used to manufacture new trailers). (See Resp't Des'g Evid., Ex. 1 ¶ 4, Ex. 3 at 3-5.)

Alloy subsequently protested the Department's determination. In a Letter of Findings dated December 1, 2010, the Department denied Alloy's protest.

On February 25, 2011, Alloy filed an original tax appeal. Both Alloy and the Department subsequently filed motions for summary judgment. The Court conducted a hearing on their cross-motions on December 3, 2012. Additional facts will be provided when necessary.

**STANDARD OF REVIEW**

Summary judgment is appropriate only when the designated evidence demonstrates that no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). Cross-motions for summary judgment do not alter this standard. Horseshoe Hammond, LLC v. Indiana Dep't of State Revenue, 865 N.E.2d 725, 727 (Ind. Tax Ct. 2007), review denied.

**LAW**

Indiana imposes an excise tax, known as the state sales tax, on retail transactions made within the state. IND. CODE § 6-2.5-2-1(a) (2006). "The person who

6

acquires property in a retail transaction is liable for the tax on the transaction[.]" I.C. § 6-2.5-2-1(b).

In an effort to encourage industrial growth and to limit the effect of tax pyramiding, the Indiana legislature has enacted several statutes that exempt from sales tax certain purchases of tangible personal property that are used or consumed in the production of other tangible personal property. See, e.g., Harlan Sprague Dawley, Inc. v. Indiana Dep't of State Revenue, 605 N.E.2d 1222, 1225, 1228 (Ind. Tax Ct. 1992). The exemption at issue in this case, found at Indiana Code § 6-2.5-4-5, provides that retail sales of electricity and natural gas by a public utility to a purchaser that uses that electricity and gas in its manufacturing process are not subject to sales tax. See IND. CODE § 6-2.5-4-5(a)-(c) (2006) (amended 2012). The exemption only applies, however, if the electricity and gas are consumed by the purchaser "as an essential and integral part of an integrated process that produces tangible personal property and those sales are separately metered . . . or[,] if those sales are not separately metered[, the electricity and natural gas is] predominately used by the purchaser for [manufacturing]." I.C. § 6-

2.5-4-5(c) (emphasis added).[4]

## ANALYSIS

In this case, the parties do not dispute that Alloy's consumption of electricity and

gas is integral to its rehabilitation process. (See, e.g., Resp't Br. Supp. Mot. Summ. J.

("Resp't Br.") at 6.) Instead, their dispute centers on whether Alloy's rehabilitation

---

[4] Indiana Code § 6-2.5-4-5 is not denominated as an "exemption" from tax, but rather as an "exclusion" from tax. See IND. CODE § 6-2.5-4-5(a)-(c) (2006) (amended 2012). The difference between the two is best explained as follows:

> A tax exemption is a provision which exempts from tax a transaction which would, in the absence of the exemption, otherwise be subject to tax. That is, there has been a statutory decision not to tax a certain transaction which is clearly within the ambit and authority of the taxing statutes to tax. On the other hand, an exclusion relates to a transaction which is not taxable because it falls outside the scope of the statute giving rise to a tax, ab initio. Transactions excluded from tax are those which by the language of the statutes are defined as beyond the reach of the tax. . . . [Moreover,] while exemptions from taxation are strictly construed against the taxpayer, statutes imposing the tax, of which exclusions are an integral part, are construed liberally in favor of the taxpayer[] and against the taxing authority.

Tarver v. World Ship Supply, Inc., 615 So.2d 423, 426 (La. Ct. App. 1993) (citation omitted), writ denied by 616 So.2d 672 (La. 1993). Nonetheless, whether a taxing provision is an exemption or an exclusion is not controlled by what it is called, but rather by its language and the effect of that language. See Adelphia House P'ship v. Commonwealth of Pennsylvania, 709 A.2d 967, 970 (Pa. Cmmw. Ct. 1998), adhered to by 719 A.2d 833 (Pa. Cmmw. Ct. 1998).

The Indiana Supreme Court and this Court have repeatedly interpreted the language contained in Indiana Code § 6-2.5-4-5(c) as providing an exemption. See, e.g., Indiana Dep't of Revenue v. Interstate Warehousing, Inc., 783 N.E.2d 248, 253 (Ind. 2003); Mynsberge v. Indiana Dep't of State Revenue, 716 N.E.2d 629, 635-36 (Ind. Tax Ct. 1999) (explaining that the exclusionary language contained in Indiana Code § 6-2.5-4-5(c) is superfluous given that Indiana Code § 6-2.5-5-5.1 already provides an identical exemption); Harlan Sprague Dawley v. Indiana Dep't of State Revenue, 605 N.E.2d 1222, 1230 (Ind. Tax Ct. 1992); Chrome Deposit Corp. v. Indiana Dep't of State Revenue, 557 N.E.2d 1110, 1114, 1117 (Ind. Tax Ct. 1990), aff'd by 578 N.E.2d. 643 (Ind. 1991). This interpretation is consistent with the notion that under Indiana Code § 6-2.5-4-5(c), it would be more practical to require a taxpayer to prove that its integrated process constitutes production rather than the Department to prove that the taxpayer's integrated process does not constitute production. See, e.g., Rotation Prods. Corp. v. Indiana Dep't of State Revenue, 690 N.E.2d 795, 798, 800-02 (Ind. Tax Ct. 1998) (explaining that a taxpayer always bears the burden of demonstrating that it is eligible for an exemption because "[a]fter all, it is the taxpayer who knows his business"). Consequently, the Court finds that Alloy's burden of demonstrating that it is entitled to the exemption precedes the Department's burden of demonstrating that Alloy is not entitled to the exemption. See Babinchak v. Town of Chesterton, 598 N.E.2d 1099, 1101 (Ind. Ct. App. 1992).

8

process constitutes production (i.e., whether the process produces tangible personal property). The Department's position is that through its rehabilitation process, Alloy merely repairs existing tanker trailers for the purpose of extending their useful lives and as a result, no production of tangible personal property occurs. (See Resp't Br. at 5-6.) Alloy's position, on the other hand, is that even when characterized as "repair," its rehabilitation process constitutes production. Specifically, it argues that when a tanker trailer has reached the end of its useful life, it is "stripped to its skeletal state and component parts are removed, replaced, or restored in some way[.]" (Pet'r Br. at 10.) Once the process is complete, Alloy contends an entirely new product has been produced: a "like-new" tanker trailer with four to seven years of life. (See Hr'g Tr. at 49.)

Nearly twenty years ago, this Court recognized that because there are a number of ways by which tangible personal property is produced, "repair" could, in certain instances, constitute production. See Rotation Prods. Corp. v. Indiana Dep't of State Revenue, 690 N.E.2d 795, 798, 800-02 (Ind. Tax Ct. 1998). More specifically, the Court explained that "transformative repair" culminated in production whereas "ordinary repair" did not:

> [i]n general, repair activity is not [exempt] . . . because ordinary repair creates no new products and is properly characterized as a service. Ordinary repair activity merely perpetuates existing products, and although ordinary repair activity may impact the number of scarce economic goods by increasing their longevity, it cannot be said that ordinary repair *produces* scarce economic goods. . . . However . . . at some point, the repair activity is so extensive in nature and so transforms the object such that it cannot be characterized as a mere service. Rather, the repair activity produces a new product and therefore constitutes exempt activity.

9

Id. at 801-02 (internal citations omitted). See also Indiana Dep't of Revenue v. Interstate Warehousing, Inc., 783 N.E.2d 248, 250-51 (Ind. 2003) (explaining that if a taxpayer does not transform property into a "distinct marketable good" for customer consumption, it is not engaged in production). To assist it in determining whether property has been transformed into a new product, the Court explained that the answers to four specific questions can prove helpful. See Rotation Prods., 690 N.E.2d at 802-03. Both Alloy and the Department assert that the outcome of this case turns exclusively on how its facts answer these four questions. (See, e.g., Pet'r Br. at 8, 10-16; Resp't Br. at 6-9; Hr'g Tr. at 37-38.)

> **QUESTION 1: What is the substantiality and complexity of the work done on the existing article and what are the physical changes to the existing article, including the addition of new parts?**

This question is designed to reveal one of the "indicators" that tangible personal property has been transformed into a new product: there has been a substantial change in the form of that property. See Rotation Prods., 690 N.E.2d at 801-03. The Court has recognized that in order to create a product that is significantly different in form from the material used to make it, a substantial amount of complex work is typically required. See id. at 802-03.

In addressing this question in its written brief, Alloy states that its rehabilitation process is substantial because a typical trailer rehab takes approximately 750 man-hours to complete over a six to eight week period. (See Pet'r Br. at 11-12.) It also states that the rehabilitation process is complex because, when distilled on paper step-by-step, the document is twelve pages long. (Pet'r Br. at 12 (citing Resp't Des'g Evid.,

10

Ex. 4 at 6-16).) Alloy therefore concludes that its rehabilitation process culminates in the production of a new product. (See Pet'r Br. at 12-13.)

While Alloy's rehabilitation process may be time-consuming and comprised of many steps,[5] the Court is not convinced that through its rehabilitation process Alloy has physically changed the form of the tanker trailer so as to constitute a new product. For example, when the Court pressed Alloy during the summary judgment hearing to explain how its rehabilitation process transformed tangible personal property into a substantially different end product, Alloy simply responded that it takes a tanker trailer at or near the end of its useful life and "transforms" it into one that can be used for another five to seven years. (See Hr'g Tr. at 50-51.) This answer, however, is more indicative of "ordinary repair." See Rotation Prods., 690 N.E.2d at 801 (explaining that "ordinary repair" does not produce goods but "merely perpetuates existing products . . . by increasing their longevity"). Compare with Hoosier Roll Shop Servs., LLC v. Indiana Dep't of State Revenue, 10 N.E.3d 1051, 1055-56 (Ind. Tax Ct. 2014) (explaining that after the taxpayer's grinding process was accomplished the end product was still a giant rolling pin, but the pin's surface was so physically different that it transformed the pin into a new tool that could only be used for an entirely different purpose), review denied.

---

[5] There is evidence before the Court that tends to augur against a finding of substantiality and complexity. For instance, there is evidence indicating that the six to eight week period to complete the rehabilitation process is often contingent not upon the nature of the project itself but rather upon Alloy's staffing schedule, how many other projects it has in its queue, and how quickly Alloy can order and receive any necessary parts. (See Boatman Aff. ¶ 7.) Moreover, there is evidence indicating that while it considers a typical rehabilitation to be comprised of 216 separate tasks, 28 of those tasks involved inspecting something, five involved painting something, and another five involved mailing something, taking photos of something, or sticking decals on something. (See Resp't Des'g Evid., Ex. 4 at 6-16.)

11

Consequently, the Court finds that answer to this question does not weigh in Alloy's favor.

**QUESTION 2:** **How does the article's value before and after the work compare?**

This second inquiry seeks to identify yet another indicator that tangible personal property has been transformed into a new product: a change in the property's value. See Rotation Prods., 690 N.E.2d at 802-03. Indeed, production often occurs when property with little or no market value has been converted into a marketable product. See id.

Alloy contends that the answer to this question weighs in its favor, as a cryogenic tanker trailer that no longer maintains its vacuum is, if not worthless, of limited value. (Boatman Aff. ¶¶ 3, 5.) It asserts that after the rehabilitation process, however, a tanker trailer's ability to haul liquid gases has been restored, and thus so has its value. (See Pet'r Br. at 14.)

With respect to this second inquiry, the Court recognizes that the rehabilitation process adds value to a tanker trailer that was not there when it first received it. Nonetheless, the evidence submitted to the Court indicates that even before rehabilitation, a tanker trailer often has other uses and therefore more than just "a little" value. Indeed, as Alloy has explained,

> the value [of a tanker trailer] prior to a first rehab . . . [could] range . . . from minimal to $5,000 for scrap value, perhaps $5,000 to $10,000 for a trailer suitable for mere storage, and a higher value for a trailer that can be used on the road but inefficient for hauling liquid gases.

(Resp't Des'g Evid., Ex. 6 at 4.) The answer to this question, therefore, does not favor Alloy either. Compare with Hoosier Roll, 10 N.E.3d at 1053 n.6, 1056 (indicating that

12

once a mill completed a job of converting slabs of raw product into sheets of finished product, the work rolls it used to make that conversion could not be used for any other purpose without being ground and calibrated with different specifications).

### QUESTION 3: How does the article's performance before and after the work compare?

This inquiry examines yet a third indicator that property has been transformed into a new product: there has been a change in its performance. See Rotation Prods., 690 N.E.2d at 802-03. In other words, production is likely occurring when tangible personal property is transformed in such a way that it performs as good as or better than when it was originally manufactured. Id. at 803.

Here, Alloy argues that the performance of a rehabilitated trailer is as good, if not better, than the performance of the original tanker trailer. (See Pet'r Br. at 15.) To support its argument, Alloy first explains that a rehabilitated tanker trailer is indistinguishable from a newly-manufactured one. (Pet'r Br. at 14-15 (explaining that during the administrative process it gave two photographs to the Department – one of a newly manufactured tanker trailer and the other of a rehabilitated one – and the Department could not distinguish between them).) (See also Resp't Des'g Evid., Ex. 7 at 36-38.) Next, Alloy explains that it "warrant[s] the work on [the] rehabilitated tanker-trailers." (Pet'r Br. at 15.) Finally, it explains that the rehabilitation process often involves "upgrading the [tanker trailer] to new standards and technologies for emissions, suspensions, engines and valves that did not exist at the time of initial manufacture." (Pet'r Br. at 15.) (See also Resp't Des'g Evid., Ex. 4 at 3-4 (asserting that "in almost all cases, [a rehabilitated] tanker has *significantly enhanced capabilities than the original trailer*").)

13

The Court is not persuaded by these explanations. Indeed, the fact that a rehabilitated tanker trailer looks like a newly-manufactured one does not speak to its performance. Moreover, Alloy's warranty does not appear to cover performance. Compare Rotation Prods., 690 N.E.2d at 803 (indicating that one way to demonstrate a change in performance is through a performance guarantee) with (Boatman Aff. ¶ 8 (stating only that "Alloy warrants rehabbed trailers for a period of one year. All Alloy rehabs and new trailers carry the same standard one-year warranty against defects in workmanship and materials")). Finally, the whole point of the rehabilitation process is to restore the bottle's capability to transport liquid gas. (See Boatman Aff. ¶¶ 3, 5; Hr'g Tr. at 44.) See also Chrome Deposit Corp. v. Indiana Dep't of State Revenue, 557 N.E.2d 1110, 1114, 1117 (Ind. Tax Ct. 1990) (indicating that taxpayer's process was not ordinary repair because it enhanced, not merely restored, the performance of customer's equipment), aff'd by 578 N.E.2d 643 (Ind. 1991). The various upgrades, if any, to a tanker trailer's air suspension, ABS braking systems, fire valves, emissions, and electrical and air systems do not improve or enhance the bottle's ability to transport the liquid gas. (See Resp't Des'g Evid., Ex. 6 at 5 (where Alloy acknowledges that the only support it has that a rehabilitated tanker trailer performs as well as a newly manufactured one is "the regular referral of trailers by customers for rehabilitation and the use of those rehabilitated trailers in the market").) As a result, the answer to this question weighs against Alloy.

**QUESTION 4:** **Was the work performed contemplated as a normal part of the life cycle of the existing article?**

This final question was designed as a "catch-all."  See Rotation Prods., 690 N.E.2d at 803.  It was formulated to recognize that routine maintenance, which merely perpetuates existing products, does not qualify for an exemption.  See id.

In answering this question, Alloy cites solely to the fact that not all owners choose to have their tanker trailers rehabilitated.  (Pet'r Br. at 15.)  In other words, Alloy claims that because an owner may choose to take his tanker trailer out of service rather than rehabilitate it, the rehabilitation process "is assuredly not a normal part of the tanker-trailer's life cycle."  (Pet'r Br. at 15.)

The Court finds that Alloy's rehabilitation process is contemplated as a normal part of a cryogenic tanker trailer's life cycle.  Indeed, when an owner finds his bottle's vacuum no longer operational, he must decide to either have it rehabbed or taken out of service.  The fact that an owner may opt to take the tanker trailer out of service does not mean, however, that the rehabilitation process is not "routine maintenance."  See Rotation Prods. Corp., 690 N.E.2d at 803 (explaining that a process that allows property to function more efficiently may be "routine maintenance," i.e., a normal part of its life cycle).  Another fact supporting the conclusion that the rehabilitation process is routine maintenance is that a tanker trailer can be rehabilitated numerous times.  (See Resp't Des'g Evid., Ex. 7 at 7.)  In fact, many of Alloy's customers rehabilitate their tanker trailers on set "cycles."  (See, e.g., Resp't Des'g Evid., Ex. 9 at 144-47 (indicating that at least one of Alloy's customers had its tanker trailers rehabbed every five years).)  As such, the answer to this question also fails to support Alloy's position.

15

**CONCLUSION**

Based on the evidence and argument before it, the Court finds that Alloy's rehabilitation process does not produce other, or new, tangible personal property. Accordingly, the Court GRANTS summary judgment in favor of the Department and AGAINST Alloy. [6]

SO ORDERED this 16th day of February 2015.

_____
Thomas G. Fisher, Senior Judge
Indiana Tax Court

DISTRIBUTION:

Craig M. McKee, Gregory F. Zoeller, John P. Lowrey

---

[6] The Court notes that the Department designated as evidence the deposition of Ted Boatman, Alloy's president. While Alloy did not cite to this deposition in its written brief, it indicated numerous times during the hearing in this matter that once the Court reviewed the deposition, "it would be clear" that Alloy was entitled judgment as a matter of law. (See, e.g., Hr'g Tr. at 40, 42, 45-47, 51-53, 55, 58.)

When a party seeks judgment as a matter of law under Indiana Trial Rule 56(C), it "shall designate to the court all parts of pleadings, depositions, answers to interrogatories, admissions, matters of judicial notice, and any other matters on which it relies for purposes of the motion." Ind. Trial Rule 56(C). Because the Rule compels a party to identify the "parts" of any document upon which it relies, it may not designate various pleadings, discovery material, and affidavits in their entirety. See Filip v. Block, 879 N.E.2d 1076, 1081 (Ind. 2008); O'Connor v. Stewart, 668 N.E.2d 720, 722 (Ind. Ct. App. 1996). Rather, "regardless of how concise or short the document is, in order to be properly designated, specific reference to the relevant portion of the document [i.e., the specific portion of the document that contains the material fact or facts upon which the moving party relies] must be made." O'Connor, 668 N.E.2d at 722. A proper designation should also include an explanation as to why those specifically designated facts are material. Kissell v. Vanes, 629 N.E.2d 878, 880 (Ind. Ct. App. 1994). The purpose for requiring this level of specificity is to decrease the amount of evidentiary material a court must sift through when ruling on a summary judgment motion. See O'Connor, 668 N.E.2d at 721-22; Kissell, 629 N.E.2d at 880 (explaining that it is not the court's responsibility to search the record and piece together a party's summary judgment argument and relevant support for it).

Mr. Boatman's deposition is nearly 200 pages long. (See Resp't Des'g Evid., Ex. 9.) Because Alloy has simply relied on and referred the Court to the deposition in toto, the Court did not review it to piece together support for Alloy's position.